UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| TANIS ALLEN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civ. No. 06-137-B-W |
| | ) | |
| WAL-MART STORES, INC., | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

In 2005, Wal-Mart eliminated its shoes and jewelry division and folded it into the apparel division to create a new "fashion merchandising" division.  This restructuring resulted in the elimination of shoes and jewelry managerial positions nationwide.  The plaintiff, Tanis Allen, was a district manager for the shoes and jewelry division when the restructuring occurred and is now an assistant manager of Wal-Mart's Palmyra store.  Ms. Allen sought but failed to secure the "district fashion merchandiser" position that replaced, and expanded upon, her former shoes and jewelry district manager position, losing out to a younger male candidate.  Ms. Allen believes that discriminatory attitudes toward a woman of her age had something to do with it, as well as with other frustrations she later experienced in the workplace.  Allen claims in this civil action that Wal-Mart discriminated against her based on age and sex and retaliated against her based on a report she made concerning employee fraternization.  Wal-Mart has filed a motion requesting summary judgment on all claims (Doc. No. 43), which the Court referred to me for recommended decision on March 5, 2008.  I recommend that the Court grant the motion.

1

**Facts**

The following facts are material to the summary judgment motion.  They are drawn from the parties' statements of material facts in accordance with Local Rule 56.  See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).

Plaintiff Tanis Allen began working for Wal-Mart in October 1992.  (Def.'s Statement of Material Facts ("DSMF") ¶ 1, Doc. No. 44.)  She initially worked as the department manager for the jewelry department at Wal-Mart's retail store in Bangor, Maine.  (Id. ¶ 2.)  From approximately August of 1995 until April 1996, Allen participated in a training program to become a district manager for shoes and jewelry.  (Id. ¶ 21.)  In April 1996, Allen was promoted to the salaried position of district manager for shoes and jewelry.  (Id. ¶ 22;  Pl.'s Opposing Statement of Material Facts and Statement of Additional Material Facts ("PSMF") ¶ 118, Doc. No. 48.)  Allen, like others in her position, reported to a regional manager for shoes and jewelry, who, in turn, reported to a divisional manager for shoes and jewelry.  (DSMF ¶ 23.)  Beginning in 2004, Allen oversaw district 204, which consisted of stores located in northern Maine.  (Id. ¶ 24.)  For three-to-four months in 2005, prior to the restructuring that eliminated her job, Allen also managed district 289, covering Southern Maine.  (Id. ¶ 6;  PSMF ¶¶ 24, 125.)  Allen was recognized for covering this extra territory and for doing "a good job balancing all of the stores and getting direction to them."  (PSMF ¶ 126.)

In May 2005, Wal-Mart announced that it was eliminating the entire shoes and jewelry division nationwide and creating a broader division called fashion merchandising that would

include apparel, shoes, and jewelry.  (DSMF ¶¶ 27, 34;  PSMF ¶ 127;  Allen Dep. at 80, 106-107.)  As a result of the restructuring, all of the positions within the shoes and jewelry division were eliminated effective later that month.  (DSMF ¶ 28.)  At the time of the announcement, Wal-Mart informed Allen and her colleagues in the shoes and jewelry division that they had the opportunity to apply for other positions within the company and that many of the new district fashion merchandiser positions would be filled by existing managers of the shoes and jewelry division.  (Id. ¶ 29;  PSMF ¶¶ 29, 129;  Allen Dep. at 85.)

The fashion merchandising position sought by Allen was a district-wide position, covering districts 204 and 289, both of her existing districts.  The successful applicant would manage the combined apparel, shoes and jewelry divisions in multiple stores across these districts.  (DSMF ¶ 43;  PSMF ¶ 43.)  Richard Bourget, a district manager for Wal-Mart, was responsible for filling the new position.  He interviewed four applicants:  Allen, Greg Patterson, Steven Putnam, and Connie Verrier.[1]  (DSMF ¶ 44.)  Prior to conducting the interviews, Bourget believed that Patterson and Putnam were more qualified than the female applicants based on the positions they had held at Wal-Mart and other work history.[2]  (PSMF ¶ 45.)  The interview

---

[1]     Allen offers a statement that Bourget chose to interview the male applicants but was required to interview the female applicants, as though he would not have interviewed the female applicants if he had been given the choice.  I simply fail to see how this inference can be drawn from the deposition testimony that Allen cites.  (PSMF ¶¶ 44, 150, citing Bourget Dep. at 118-121, Doc. No. 43-6.)  Plaintiff's counsel asked Bourget why he chose to interview Putnam (male) and Verrier (female).  Bourget explained that he chose to interview them because of their respective background experience.  (Bourget Dep. at 119-120.)  Counsel then asked whether there was a requirement "to interview everybody who had been a district manager for shoes and jewelry."  (Id. at 121.)  Bourget responded that that was his understanding, "that they would receive an interview regardless of whether or not they met the minimum criteria."  (Id.)  Subsequently, when asked why he chose to interview Allen, Bourget said it was because she was a jewelry and shoe district manager.  (Id.)  Counsel never asked Bourget the questions that Allen wants to supply the answers for, which were whether Bourget would have interviewed Allen if he had not understood he was supposed to, or whether Bourget felt that Allen failed to meet the minimum criteria for the fashion merchandiser position.

[2]     Allen asserts that Bourget's preconceptions were entirely baseless because he had never supervised her.  (PSMF ¶ 151.)  Allen appears to be advancing an unstated inference that Bourget's preconceptions were based on a preference for male applicants, but that inference does not follow from the testimony.  Instead, the testimony is to the effect that Bourget knew of all the applicants, understood their respective background experience within Wal-

3

process did not disturb Bourget's preconception, as he ultimately ranked them as follows:  (1) Patterson; (2) Putnam; (3) Allen; and (4) Verrier. (DSMF ¶ 45.)  Bourget explained his choice of Patterson based on the fact that Patterson had substantial apparel experience, as well as "big box" management experience, and Bourget regarded apparel as the primary focus of creating the fashion merchandiser division.  (Id. ¶¶ 46, 47.)  Allen challenges the idea that apparel could legitimately have been treated by Bourget as a particularly important qualification because shoes and jewelry experience was also a relevant qualification and because apparel experience was not mandatory.  Also, there does not appear to have ever been a directive from any more senior management that those making the hiring decision should treat apparel experience as the most significant qualification.  (PSMF ¶ 46.)

Concerning Bourget's professed preference for someone with apparel experience, the record reflects that apparel constitutes a greater percentage of the Wal-Mart's revenue than shoes and jewelry and that Wal-Mart devotes more floor space to apparel[3] than to the other fashion merchandise.  (DSMF ¶¶ 38, 39.)  At the time of the restructuring, Wal-Mart's apparel business was not doing as well as expected.  (Id. ¶ 40.)  The new fashion merchandise division is designed to place a focus on overall apparel from a multi-unit perspective because it needed more attention to increase sales and profitability and to stay competitive in a challenging fashion retail environment.  (Id. ¶¶ 37, 41, 42;  PSMF ¶ 128.)

---

Mart, and considered store management experience and apparel experience to be a better qualification than shoes and jewelry district management experience.  (Bourget Dep. at 127-28.)

[3]     Like the term fashion, the term apparel describes a potentially broad category of personal adornment.  It appears from the parties' submissions that the term apparel is meant to signify clothes, as in tops, bottoms, dresses, etc., as distinct from shoes and jewelry.  However, as far as the combined fashion merchandise division is concerned, the idea was to market all fashion apparel, including clothes, shoes and jewelry, from a multi-unit perspective, rather than independently.  (Allen Dep. Ex. 3, Doc. No. 43-5;  Bourget Dep. at 98.)  Prior to the restructuring, apparel marketing was one of the responsibilities of store managers and district managers.  (Bourget Dep. at 96-97;  Patterson Dep. at 163, Doc. No. 43-8.)

Patterson's experience at Wal-Mart included work as a store manager, a co-manager, and an assistant manager.[4]  (Id. ¶ 48.)  Patterson oversaw apparel departments as a store manager, a co-manager, and an assistant manager in several (more than five) Wal-Mart stores, included some super centers.  (Id. ¶¶ 49, 50, 52.)  This background gave Patterson appreciable experience with merchandising, marketing, and selling apparel in a retail environment, as well as experience with all of the general operations of an entire store.  (Id. ¶¶ 51, 52.)

As compared with Patterson, Allen's experience with Wal-Mart was limited to the shoes and jewelry departments of numerous stores.  (Id. ¶ 55.)  She possessed relevant fashion merchandising experience, simply in the shoes and jewelry department.  (Id. ¶ 57;  PSMF ¶ 57.)

Patterson was 42 years of age when he accepted the fashion merchandiser position.  (DSMF ¶ 62.)  Allen was 59 at the time.  (PSMF ¶ 117; Allen Dep. Ex. 5.)

After Patterson received the fashion merchandiser position, Allen sought out an assistant manager position.  According to Allen's testimony, she spoke with Wal-Mart's "regional human relations person," Alan Heinbaugh, who told her "that that was available" and that "before [she] applied for the assistant manager position that [she] needed to go through that assistant manager

---

[4]     Wal-Mart stores are managed by a store manager.  (DSMF ¶ 7.)  Store Managers are responsible for overseeing an entire retail store, which consists of approximately 50 departments.  (Id. ¶¶ 8, 9.)  They report to district managers (like Mr. Bourget), who supervise overall operations of several stores within a geographical district.  (Id. ¶¶ 10, 11.)  Store managers are sometimes assisted (depending on store size) by subordinate managers known as co-managers, who help run the entire store.  (Id. ¶ 12.)  Wal-Mart stores are also managed by assistant managers, who supervise a group of departments, usually on a rotational basis, and report to the store manager and co-manager(s). (Id. ¶¶ 5, 14, 15, 16.)  Next are the department managers, followed by associates.  (Id. ¶¶ 4.)

Alongside this store management hierarchy are the former shoes and jewelry division of certain specialty lines, of which the shoes and jewelry division was one.  (Id.)  As a district manager of shoes and jewelry, Ms. Allen was outside of the store-specific hierarchy and reported to a regional manager of shoes and jewelry, who reported in turn to a divisional manager of shoes and jewelry.  (PSMF ¶ 11;  PSMF ¶ 123.)  All of these managerial positions in shoes and jewelry were eliminated in the restructuring at issue in this case.  (DSMF ¶ 28.)

It appears implicit from the parties' statements that the former shoes and jewelry division was represented at the store level by a shoes and jewelry department with its own department manager.  That department manager appears to have been in the reporting hierarchy of both store management and the shoes and jewelry division management, so that an assistant manager, store co-manager and store manager would have some supervisory experience related to the shoes and jewelry department., though not as much as a shoes and jewelry district manager.  (E.g., PSMF ¶¶179, 180.)

training program."   (DSMF ¶ 68;  Allen Dep. at 113-114.)  Allen asked Heinbaugh if she could participate in the company's co-manager-in-training program, which is designed to train future store managers.   (DSMF ¶¶ 69, 72, 73.)  Heinbaugh responded that Wal-Mart no longer offered that program.  (Id. ¶ 70.)  Formerly, Wal-Mart typically offered the co-manager-in-training program only to external hires as a recruiting tool, something that Allen admits.  (Id. ¶ 71.)  Allen also admits that the co-manager-in-training program was eliminated in 2005, prior to her inquiry regarding the program.  (Id. ¶ 74.)  Heinbaugh testified that he does not recall this conversation with Allen and that he does not believe it took place.  (PSMF ¶¶ 68-70;  Heinbaugh Dep. at 199.)

Allen admits that Wal-Mart replaced its earlier co-manager-in-training program with two different accelerated training programs:  (1) an accelerated co-manager training program for individuals who wished to become store managers; and (2) an accelerated assistant manager training program for individuals who wished to become co-managers.  (DSMF ¶ 75;  PSMF ¶ 75.)  Allen admits that these programs were used principally to recruit individuals from outside Wal-Mart.  (Id. ¶ 76.)  She also admits that, in order to become a co-manager, an associate needs to have experience with the various departments within a store.  (Id. ¶ 78.)

Allen told Heinbaugh that it was her understanding that a certain male individual was presently in the co-manager-in-training program.  (DSMF ¶ 80.)  Heinbaugh explained that the individual was an external hire who entered the program prior to its elimination.  (Id. ¶¶ 81, 82.)

Based on the options presented to her, Allen accepted Heinbaugh's invitation to participate in the assistant manager training program.  (Id. ¶ 84;  PSMF ¶ 84.)  The program lasted sixteen weeks, but Allen was given the option of leaving three weeks into it and going directly into an assistant manager position.  (DSMF ¶¶ 85, 86.)  Allen chose to remain in the

6

program for twelve weeks, instead of the full, sixteen-week session.  (Id. ¶¶ 86-88.)  Allen's base salary remained the same as it had been when she was a district manager for shoes and jewelry, but she lost stock option eligibility, her bonus potential decreased, and she no longer had a company car.  (Id. ¶ 89;  PSMF ¶¶ 89, 122.)

Allen's training program was conducted by Albert Bostic.  After conferring with Bourget, Bostic offered Allen an assistant manager position in Wal-Mart's Waterville store, within Bourget's district, and Allen started in that position in November 2005.[5]  (DSMF ¶¶ 94-97.)  This assign required Allen to commute 62 miles.  (PSMF ¶ 222.)  An assignment inside of Bostic's district would have placed her closer to home.  Allen admits in her opposing statement that Bostic did not have any open assistant manager position in his district because Allen joined his training program late.  (DSMF ¶ 93;  PSMF ¶ 93.)  She also does not deny that Bostic had already committed the available positions in his district to existing program participants.  (PSMF ¶ 92;  DSMF ¶ 92.)  She only qualifies the statement with an assertion that the program participants did not know during training which store they would be assigned to.  (PSMF ¶92.)

At some unspecified time after she began working in Waterville, Allen had a conversation with an assistant manager in Wal-Mart's Palmyra store who wanted to be located at the Waterville store.  This interested Allen because the Palmyra store was closer to her home and would cut her one-hour commute roughly in half.  Allen spoke with Bourget about a possible swap of positions and he stated that Wal-Mart policy required her to remain in her current position for six months, a policy she concedes she was already aware of.  (Id. ¶¶ 99, 101, 102; PSMF ¶¶ 99, 101, 102;  Allen Dep. at 141-42.)  Bourget could have requested an exception from

---

[5]        Based on the cited portion of Allen's deposition transcript, Bostic managed the district that included the Bangor, Brewer, Lincoln and Palmyra stores (possibly others).  A position in Bostic's district would have been preferable for Allen because she lived in the Bangor area.  (Allen Dep. at 135-138.)

the home office but chose not to.  (PSMF ¶ 101.)  Sometime after Allen had completed six

months in Waterville she repeated her request for a transfer to the Palmyra store and her request

was granted.  (DSMF ¶ 100;  Allen Dep. at 142.)

Meanwhile, in March 2006 (prior her transfer to Palmyra), roughly four months into her

position in Waterville, Allen filed a charge of discrimination with the Maine Human Rights

Commission (MHRC) and the Equal Employment Opportunity Commission (EEOC).  (DSMF ¶

103.)

<em>Allen's case for why it was discriminatory<br>for Bourget to hire Patterson for the fashion merchandiser position</em>

Allen makes a series of statements designed to raise the inference that Bourget's

professed focus on apparel experience as a "very important" qualification was a pretext for

gender or age discrimination.   (Bourget Dep. at 102-103.)  In particular, she cites Alan

Heinbaugh's testimony that apparel experience was not a prerequisite for the job, only a

"beneficial" qualification, and his testimony that he disagrees with the position that apparel

experience was "extremely important" for the fashion manager position.  (PSMF ¶¶ 134, 135,

137; Heinbaugh Dep. at 161-164.)  The "extremely important" descriptor comes from Wal-

Mart's statement of position to the EEOC, which included the following paragraph:

> Market Manager Rich Bourget conducted the interviews for the Fashion
> Merchandiser position for District 204.  In Mr. Bourget's opinion, the
> Complainant was not the most qualified candidate for this position.  Mr. Bourget
> considered the most qualified candidate to be Gerald (Greg) Patterson, a Store
> Manager with approximately 18 years of Wal-Mart experience.  Mr. Patterson had
> been a Store Manager for approximately five years and had been a Co-Manager
> prior to that.  He also had five years experience as an Assistant Manager.  As a
> Store Manager and Co-Manager, Mr. Patterson had had a wide variety of
> experience in all departments, including apparel.  Meanwhile, the entirety of the
> Complainant's experience with Wal-Mart had been in the Shoe and jewelry
> department.  Mr. Patterson clearly was more qualified for the Fashion
> Merchandiser position than the Complainant.  Apparel experience was extremely

8

> important for the Fashion Merchandiser position, and Mr. Patterson had that experience as a result of his years of service as a Store Manager and a Co-Manager.  Further, Mr. Patterson had been employed with Wal-Mart longer than the Complainant.  Mr. Patterson's apparel experience and extensive experience in Wal-Mart management, combined with his longer length of service with Wal-Mart, made him a more appealing and more qualified candidate for the Fashion Merchandiser position that the Complainant.  Wal-Mart ultimately hired Mr. Patterson as the Fashion Merchandiser for District 204.

(Position Statement at 5, Bourget Dep. Ex. 1, Doc. No. 50.)

Other statements offered by Allen are designed to show that Allen possessed beneficial experience that Patterson did not.  Thus, she states that experience managing inventory shrinkage and merchandising for multiple Wal-Mart stores (at the same time) was a beneficial characteristic for applicants to the fashion merchandiser position (PSMF ¶ 138); that the first "essential function" line item in the job description was "[managing] the fashion merchandising of multiple facilities and continuous traveling within district region" (id. ¶ 140); and that her prior work experience included "timely, accurate and safe setup of merchandize" in store display systems, one of the "merchandising" line items in the job description (id. ¶ 143).

The job description for the fashion merchandiser position contains three pages of bullet points on job responsibilities, key characteristics and essential functions.  (Job Description, Bourget Dep. Ex. 4, Doc. No. 50 at 30-32.)  The description does not include language to the effect that experience in a Wal-Mart apparel department is a prerequisite that an applicant must have to obtain the job.   Apparel is repeatedly listed under the fashion merchandising subheading of the job responsibilities section, in terms of "apparel initiatives," "apparel execution," "apparel direction," and "apparel needs."  (Id. at 31.)  In turn, management of "fashion merchandising" at multiple facilities is a bulleted item under the essential functions heading.  (Id. at 32.)  When questioned about the contents of the job description, Bourget agreed that the description does not

state that prior apparel experience is necessary, but he also expressed the view that apparel experience was identified in the job description and that one "would have to have knowledge of the fashion areas in order to manage them."[6]  (PSMF ¶ 146;  Def.'s Reply Statement of Material Facts (DRSMF) ¶ 146, Doc. No. 57;  Bourget Dep. at 100-101.)  Subsequently, Bourget was asked about the interview script that Wal-Mart devised in relation to the new positions.  When asked whether "anything on this document indicate[s] that apparel is weighted more heavily than shoes and jewelry in terms of qualification for the position," Bourget responded:  "They have apparel first in every sentence."  (Bourget Dep. at 145-46.)  This was the only emphasis on apparel that he could identify in the script;  that apparel is listed first among the three terms "apparel, shoes, and jewelry."  (PSMF ¶ 147.)

Bourget has no recollection of whether he asked Allen if she had "apparel experience" from her work prior to joining Wal-Mart.  When considering Putnam's application, however, Bourget noted that Putnam had apparel experience from working at K-Mart.  (PSMF ¶ 152.) Bourget noted that Allen had "no Wal-Mart apparel knowledge," but failed to rule out whether she had other apparel experience outside of Wal-Mart.  (Id.)  The cited transcript also reflects that Putnam had five years of experience as a store manager at Wal-Mart.  (DRSMF ¶ 152; Bourget Dep. at 119-120.)  Allen does not cite any record evidence suggesting she actually has any apparel experience or that it was reflected in her application materials.

---

[6]     Allen cites Bourget's deposition transcript in support of a statement about what the job description says. Allen wants a statement that the job description "did not indicate that prior apparel experience was an eligibility criteria, 'requirement,' or 'essential function.'"  (PSMF ¶146.)  Wal-Mart denies that Bourget's testimony can be cited in support of such a statement and cites another portion of the transcript in which Bourget discusses how apparel factors in to the job description.  (See Bourget Dep. at 99-103, 112.)  The end result of a review of this testimony is that managerial experience with Wal-Mart's apparel department was not a prerequisite.  Oddly, despite the parties' refusal to agree, there does not appear to be any disagreement from what I can see in the record about the simple fact that Allen was not disqualified from obtaining the position simply because she had never worked in or managed the apparel department at Wal-Mart.  Nor has Bourget apparently ever stated that Allen was unqualified for the job.

Before he conducted interviews, Bourget reviewed the applicants' Associate History Profiles (HPROs).  (PSMF ¶ 154;  DSMF ¶154.)  The HPROs contained demographic data on each applicant, including gender, date of birth, race, marital status, and medical leave history.  (PSMF ¶ 155;  DSMF ¶155.)  Patterson's HPRO summarized his prior evaluations according to a value different than the HPRO for Tanis Allen.  Patterson was scored "on-target" with respect to his 2006 evaluation and "above target" with respect to his 2005 evaluation, whereas Allen was scored 3.3 and 3.5, respectively, on a scale of 1.0 through 5.0.[7]  (PSMF ¶ 210.)  Bourget could not explain the discrepancy, but there is no evidence suggesting that he prepared the HPROs.[8]  (Id. ¶ 211.)  The only apparel-related training that Bourget could identify on Patterson's HPRO occurred in 1988 and 1989 when Patterson received general training regarding the various areas of merchandise sold in Wal-Mart stores.  (Id. ¶ 186.)  Patterson received no additional training in connection with becoming a fashion merchandiser.  (Id. ¶ 213.)

Bourget used an interview script that was designed for interviewing all candidates for fashion merchandiser positions at Wal-Mart.  (PSMF ¶ 160.)  Bourget believed that the script was an effective means of identifying applicants' leadership, communication, and team building characteristics.  (Id. ¶ 161.)  Bourget chose to ask each candidate the first three questions on the interview script, and then to ask each candidate only one question from various categories[9] of questions that comprised the remainder of the interview script, so that Allen and Patterson were asked some different questions.  (Id. ¶¶ 162, 170;  DRSMF ¶ 170.)  Bourget could not say why

---

[7]    The successful male applicant for the fashioner merchandiser position in the northern Maine district, which position Allen did not apply for and Bourget did not conduct interviews for, was also scored in his HPRO using the "on-target" terminology rather than a numerical scale.  (PSMF ¶ 210.)

[8]    No one has bothered to indicate what Patterson's numerical scores were on his 2006 and 2005 evaluations.

[9]    The categories were communication, decision making and problem solving, leadership, quality and integrity.  (Interview Script, Bourget Dep. Ex. 5, Doc. No. 50 at 34-36.)

he believed that he was not required to ask all of the questions from the interview script during each candidate's interview.  (PSMF ¶ 164.)

Connie Verrier appears to have obtained a copy of the interview script in advance of her interview, which is not something that should have happened, according to the Wal-Mart deponents.  Bourget testified that he did not know how Ms. Verrier would have accessed it; that he did not know if the jewelry and shoe district managers had access to it.  (Id. ¶¶ 156, 157, 166, 167, 168;  DRSMF ¶166.)  Bourget testified that he would be concerned about the fairness of the interview process if he learned that Patterson, the candidate whom he selected for the position, had received a copy of the interview script in advance of his interview, but that he had no information to believe that that was the case.  (PSMF ¶169;  DRSMF ¶ 169.)

During Patterson's deposition, Allen's counsel presented him with a copy of the interview script in which Patterson had hand-written an answer to every single question.  (PSMF ¶ 174; Patterson Dep. Ex. 2, Doc. No. 52 at 8-11.)  Patterson testified that he did not recall obtaining the script prior to his interview, but it is a fair inference that he would not have filled out the script after the interview.  (PSMF ¶ 175.)

As a former district manager for shoes and jewelry, Allen had experience managing the inventory and shrinkage of the shoes and jewelry departments in multiple stores at the same time. In comparison, Patterson had experience managing inventory and shrinkage of a larger number of departments in multiple stores, but not in multiple stores at the same time.  (PSMF ¶¶ 178, 192, 212;  DRSMF ¶¶ 178, 192, 212.)  As for knowledge of and experience in shoes and jewelry merchandising, Allen's experience would have exceeded Patterson's, based on their respective backgrounds.  (PSMF ¶¶ 179, 180.)

12

Evaluations that Patterson received for 2006 identified certain "areas of opportunity."  It seems a fair inference that these comments amount to areas in which a store's performance (for which store management is responsible) could improve, meaning that they reflect relative shortcomings in his performance.  One area of opportunity concerned "effective presentation of merchandise."  (Id. ¶ 182.)  Another indicated that "stores[10] have struggled all year maintaining consistent rack rules (over stuffing racks)."  (Id. ¶ 183.)  Another indicated that "stores have struggled all year consistently showing the value ([home office] price adjustments)."  (Id. ¶ 184.) Another indicated that "stores have struggled with inventory levels throughout the year.  We need to do a better job organizing by department and category."  (Id. ¶ 185.)

Patterson's January 2003 management performance appraisal for his work as store manager of Wal-Mart's Brunswick store stated that Patterson's "store tours" were inconsistent; that the "cart rail" was not set to the company standard; that his "store within a store" performance was not good; that his "STAR performance" was not good; and that his "rollback execution" was "poor."  (Id. ¶¶ 187, 188, 189, 190, 191;  Bourget Dep. Ex. 11.[11])  After this appraisal Patterson stepped down from this store manager position and became a co-manager at Wal-Mart's Augusta store in 2003.[12]  (PSMF ¶ 193;  DRSMF ¶ 193.)  Thereafter Patterson applied for another store manager position in Ware, Massachusetts, but was rejected for that

---

[10]     Evidently, Patterson's store in Brunswick was not the only one criticized by Mr. Vega.

[11]     The 2003 performance appraisal reflects a numerical rating of 3.3 for "overall performance," which corresponds with "meets expectations" on the key on the second page.  (Bourget Dep. Ex. 11.)

[12]     Allen says that Patterson was demoted, but cites deposition testimony from Heinbaugh (who appears not to have had any role in the matter whatsoever) to the effect that he understood it to be a voluntary decision on Patterson's part.  Wal-Mart denies the "demotion" statement and supports the denial with Patterson's testimony that his decision arose from wanting a less demanding position.  (DRSMF ¶ 193.)  Allen also offers statements about personal reasons why Patterson would have chosen to step down, including the "minor factor" that he did not like his supervisor.  (PSMF ¶¶ 196, 197, 198, 199, 200;  DRSMF ¶¶ 197, 198.)  The record evidently does not contain any evidence that Patterson was involuntarily reassigned.  Nor is there any circumstantial evidence to the effect that the comments contained on the 2003 appraisal (many of which were positive) were the sort that would make an involuntary demotion or reassignment predictable, particularly as his overall score of 3.3 "meets expectations." (Bourget Dep. Ex. 11.)

position.[13]  (Id. ¶ 194.)   After being passed over for the position in Ware, Patterson did not apply

for any other store manager positions.  (Id. ¶ 195.)  During Patterson's interview for the fashion

merchandiser position, Bourget did not ask Patterson to explain why he went from store manager

to co-manager in 2003.  (Id. ¶ 172.)  Bourget testified that he thought Patterson may have chosen

a voluntary demotion from manager to co-manager for personal or family reasons, but Bourget

does not know why he believes that to be the case.  (Id. ¶ 173.)

### Allen's evidence as to why denial of access to the co-manager training program was discriminatory

Wal-Mart's EEOC position statement states that Heinbaugh advised Allen that the co-

manager training program was typically available only for external hires, and that she would

need supervisor approval in order to enter that program.   (Id. ¶ 217; Heinbaugh Dep. Ex. 1.)  At

his deposition, Heinbaugh responded, "no," when asked whether he ever discussed the co-

manager training program with Allen.  (PSMF ¶ 217;  Heinbaugh Dep. at 193.)  He further

testified that he did not believe the representation in the position statement was true; that he did

not believe he had ever told her anything about the co-manager training program.[14]  (PSMF ¶

217;  Heinbaugh Dep. at 199.)

### Allen's evidence of why assignment to the Waterville store was retaliatory

While in the assistant manager training program, Ms. Allen complained about

fraternization between two participants in the training program, one of whom, she believed, was

---

[13]      No information is provided about the other candidates for that position.

[14]      Wal-Mart's assertion in its position statement is roughly consistent with Allen's version of events.  Allen
described this conversation with Heinbaugh at her own deposition and her testimony is consistent with Wal-Mart's
position that Heinbaugh told her the program was no longer available and that it had been for training external hires.
(DSMF ¶ 70;  PSMF ¶ 70;  Allen Dep. at 116-120.)  Neither Allen nor Heinbaugh appear to have said anything to
support Wal-Mart's assertion that Heinbaugh said supervisor approval could get Allen into the co-manager training
program.  Neither Heinbaugh nor Allen recollect that he ever told her what it would take to enter that program.
(Allen Dep. at 120;  Heinbaugh Dep. at 199.)  Allen testified that he steered her into the assistant manager training
program instead.  (Allen Dep. at 121.)

"hand-picked by Mr. Bostic to be in that class." (PSMF ¶ 221; Allen Dep. at 143-44.) She was subsequently assigned to the Waterville store, 62 miles from her home. (PSMF ¶ 222; Allen Dep. at 22.) Heinbaugh testified that he would be surprised to learn that Allen was assigned to work as an assistant manager at a location that required her to commute 60 miles from her home, and that he is not aware of any other assistant manager who was assigned to a store that entailed such a long-distance commute. (PSMF ¶ 223.) Allen recalls discussing with either Bostic or Bourget at the time she was told of her assignment to Waterville that she could seek a transfer closer to home when a position became available and she acknowledges that she was, in fact, permitted to transfer (Allen Dep. at 141), but she complains that she should not have been made to comply with Wal-Mart's policy that transfers not be requested prior to six-months in the existing position, because Heinbaugh testified that it might be possible to get approval from the home office for an exception to the policy to accommodate a swap in positions for two assistant managers who wanted to swap locations.[15] (PSMF ¶ 224; DRSMF ¶224; Allen Dep. at 141-42; Heinbaugh Dep. at 212-13.)

<u>*Additional statements offered by Allen*</u>

Heinbaugh handled approximately 20 discrimination complaints when he was a store manager. Heinbaugh never reached a conclusion that the discrimination alleged in any of these complaints had occurred. (<u>Id.</u> ¶ 226.) Bourget could not recall when he received discrimination or harassment training during his employment at Wal-Mart, how frequently he received such training, the number of times he received such training, the duration of such training sessions, the

---

[15]      In connection with the restructuring that eliminated the shoes and jewelry positions, managers who had not been in their positions for six months when the positions were eliminated were eligible to apply for a fashion merchandiser position. (PSMF ¶ 225.) These situations are distinguishable, of course.

number of employees who attended such training sessions, who led such training sessions, or anything that he learned from such training sessions.  (Id. ¶ 227.)

Wal-Mart employees are required to receive discrimination training through Computer-Based-Learning-Modules ("CBLs"). To satisfy this requirement, Wal-Mart employees must pass a test regarding discrimination policies and procedures covered by the CBL.  Employees must retake the test until they achieve a passing score.  Bourget is not aware of any Wal-Mart employee who has not passed a CBL discrimination test.  (Id. ¶ 228.)

Bourget does not recall ever having concluded that the subject of a discrimination complaint had, in fact, engaged in discriminatory conduct, and Bourget does not recall ever disciplining any employee in connection with a discrimination complaint during his tenure as a District Manager.  (Id. ¶ 229.)

Wal-Mart has used "placement goals," or regional gender-balancing targets, to influence the percentage of female store managers, co-managers, and district managers it hires.  (Id. ¶ 231.) Gender balancing was not a factor in hiring candidates for fashion merchandiser positions.  (Id. ¶ 232.)

Heinbaugh was directed to "build a larger diversity pool" (i.e., "women and minorities") in his written evaluation in 2005.  (Id. ¶ 233.)  Heinbaugh testified that although Wal-Mart did not issue an explicit instruction to utilize gender as a factor in hiring decisions for managers, co-managers and district managers, "you were supposed to hit a certain percentage" and "[i]t was part of the goals so you did it."  (Id. ¶ 234.)

Allen knows of at least three other women over the age of forty who applied for a fashion manager position and did not receive it.  (Id. ¶ 235.)  Heinbaugh testified that he is sure there are

16

women who received a fashion merchandiser position in his region, but he could not recall their names.  (Id. ¶ 236;  DRSMF ¶ 236.)

## Discussion[16]

A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation.  Merch. Ins. Co. v. U. S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

Allen asserts four counts in her complaint.  Count I is a claim of employment discrimination advanced under Title VII.  Count II is a claim of retaliation, also advanced under Title VII.  Count III is a another claim of discrimination, but one advanced under the Age Discrimination in Employment Act (ADEA).  Count IV is a retaliation claim under the ADEA.

---

[16]     Wal-Mart has requested an opportunity to argue its motion orally.  (Def.'s Mot. for Summ. J., Doc. No. 43.) Local Rule 7(f) grants this Court discretion as to whether to allow oral argument.  I conclude that the issues presented by the motion are sufficiently clear based on the parties' written submissions and that an oral argument is not warranted.  However, in the event that the parties object to my recommendation on the motion, the Court may decide to entertain oral argument from the parties if they simply renew their request.

The discrimination claims in Count I and Count III are both based on a disparate treatment theory and, insofar as there is no direct evidence of discrimination based on either age or sex, can be addressed in unison.  Similarly, because there is no direct evidence of retaliation, Count II and Count IV can also be addressed in unison.

## A.     Disparate Treatment

Both the ADEA and Title VII prohibit discrimination in regard to the hiring decision and other employment decisions that impact the terms and conditions of employment; the former statute based on age, the latter based on race, color, religion, sex, or national origin.  29 U.S.C. § 623(a)(1); 42 U.S.C. § 2000e-2(a)(1).  In the summary judgment context, when an employer is charged with discrimination and there is no direct evidence that discriminatory animus motivated the challenged employment action, courts utilize the "McDonnell Douglas framework" to determine whether the available circumstantial evidence is sufficient to enable a fact finder to conclude following trial, without speculation, that the challenged employment decision was more likely than not motivated by animus toward the plaintiff based on his or her membership in a protected class.  Weston-Smith v. Cooley Dickinson Hosp., Inc., 282 F.3d 60, 64-65 (1st Cir. 2002) (discussing the summary judgment distinctions drawn between cases relying on direct versus circumstantial evidence) (Title VII);  Alvarez-Fonseca v. Pepsi Cola Bottling Co., 152 F.3d 17, 24 (1st Cir. 1998) (ADEA);  see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1995) (establishing the standard for determining summary judgment motions in cases where direct evidence of discriminatory motive is not available).  The McDonnell Douglas framework is applied in three steps.  Initially, the plaintiff must establish a *prima facie* case of discrimination from which a presumption of discrimination arises.  The burden then shifts to the employer to rebut the presumption by presenting (not proving) a legitimate, nondiscriminatory

18

justification for the challenged employment action.  Finally, the burden returns to the plaintiff to prove that discrimination was the more likely motive, principally by presenting evidence that the employer's justification is unlikely, thereby exposing it as a pretext for discrimination.  Lewis v. City of Boston, 321 F.3d 207, 213-14 (1st Cir. 2003).  Of course, the use of this procedural framework in the context of analyzing a motion for summary judgment does not increase plaintiff's ultimate burden of presenting sufficient admissible evidence from which a factfinder could reasonably infer that discrimination based upon plaintiff's membership in a protected class was more likely than not the reason for the adverse employment action.   Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000).

Allen's claims of disparate treatment arise from three events:  (1) Wal-Mart's failure to hire her for the fashion merchandiser position;  (2) Wal-Mart's denial of her request for co-manager training;  and (3) Wal-Mart's initial assignment of Allen to an assistant manager position in Waterville rather than closer to her home.[17]

### 1.  **Prima facie** *case*

A *prima facie* case of disparate treatment consists of proof that the plaintiff was qualified for a position or benefit that she sought and was denied, and that the position or benefit was provided to a person outside of the protected categories having otherwise similar qualifications. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (1981); Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 327-28 (1st Cir. 1996).  Wal-Mart argues that Allen does not have a *prima facie* case to support her second and third discrimination scenarios.  I agree with respect to

---

[17]        Wal-Mart's motion posits a possible fourth theory that Allen suffered disparate treatment because she was placed in an assistant manger training program and not permitted to go directly into an assistant manager position without training.  Wal-Mart argues that Allen cannot make out a *prima facie* case on such a claim because Allen was not qualified to transfer directly into an assistant manager position without any training.  (Def.'s Mot. Summ. J. at 12.)  It appears that Allen agrees because she does not advance such a claim in her opposition memorandum.

the second scenario (denial of access to a co-manager training program).  As for the third, it is a difficult question to call, and might warrant a legal ruling, but I conclude in this case that it is better to assume that Allen's testimony is minimally sufficient to generate a *prima facie* showing.

### a.   *The fashion merchandiser position*

Wal-Mart does not assert any argument that would require Allen to shoulder the initial burden of demonstrating a *prima facie* case concerning the fashion manager position.  Wal-Mart focuses instead on the pretext contest.

### b.   *The co-manager training program*

Wal-Mart does challenge Allen's ability to state a *prima facie* case concerning her failure to gain admission to a co-manager training program, stating that the program no longer existed and that she was not qualified for it in any event, having never served as an assistant store manager.  I conclude that Wal-Mart wins out on this contest because Allen effectively admits that she was not a proper candidate for this program and that the program was phased out prior to her request to enter it.  Allen admits that Wal-Mart typically offered the program only to external hires as a recruiting tool.  (DSMF ¶ 71;  PSMF ¶ 71.)  Allen admits that the program was eliminated in 2005, prior to her inquiry regarding the program.  (Id. ¶ 74.)  She also admits that an associate needs to have experience with the various departments within a store in order to become a co-manager.  (Id. ¶ 78.)  The record reflects that Allen's experience was limited to the shoes and jewelry department.

Allen argues that this claim should be viable because "the timing of the change to the . . . program supports a reasonable inference of discriminatory intent . . . . to prevent displaced [shoes and jewelry district managers] from participating."  (Pl.'s Mem. in Opp'n at 18.)

Additionally, Allen alludes to the fact that Heinbaugh disavowed ever telling Allen that she needed supervisor approval to enter a co-manager training program.  (Id.)

In light of Allen's admissions regarding her lack of qualifications to enter the co-manager training program, I conclude that she fails to make out a *prima facie* case on this claim.  Allen's departmental experience was limited to shoes and jewelry, which meant that she had never worked in or supervised the vast majority of departments in a Wal-Mart store.  Allen fails to offer any evidence why she should have been permitted to leapfrog over the ordinary developmental processes by which Wal-Mart associates come to supervise multiple departments, before serving as assistant managers, and before becoming co-managers in turn.  The fact that Heinbaugh testified that he does not recall ever telling Allen that she required supervisor approval to enter the program does not establish that she was, in fact, qualified for the program, even if Wal-Mart asserted during EEOC proceedings that lack of supervisor approval was among the obstacles that prevented her from accessing this program.  As for the timing of the change to the co-manager training program, that change would have effected all displaced shoes and jewelry managers, without regard to age or sex or other characteristics.

> c.   *Waterville assignment*

Wal-Mart argues that the decision to assign Allen to Waterville is not actionable because it was not an adverse employment action to place her in this assistant manager position as opposed to any other assistant manager position.  (Def.'s Mot. Summ. J. at 13-14.)  Allen responds that it was an adverse action because her commute was substantially longer.  (Pl.'s Mem. in Opp'n at 18.)  In her favor, she has Heinbaugh's testimony that her commute was uncommonly long at 60 miles.  On the other hand, she is presently commuting roughly 30 miles, so that her extended commute was only a temporary imposition of an additional 30 miles.

Although there is some persuasive precedent to the effect that extended commutes are not adverse employment actions so long as the job placement is "a full-fledged job," Grande v. State Farm Mut. Auto. Ins. Co., 83 F. Supp. 2d 559, 563 (E.D. Penn. 2000), I conclude that it is preferable not to decide on these facts whether the imposition of an additional 30 minutes of commute time for a six month period necessarily amounts to an adverse employment measure.[18] This claim is effectively precluded based on Allen's inadequate pretext showing, discussed below.

### 2. *Legitimate, nondiscriminatory justifications and pretext*

The discrimination scenarios (non-retaliation) remaining to address are the first and the third. As for the first (Wal-Mart's failure to hire Allen for the fashion merchandiser position), Wal-Mart's legitimate, nondiscriminatory justification is that Bourget selected Patterson for the position because he was more qualified due to his apparel experience and store management experience. (Def.'s Mot. for Summ. J. at 7.) Wal-Mart's statement of material facts contains evidentiary support for the stated rationale, which is sufficient to satisfy Wal-Mart's burden of production. As for the third scenario (the Waterville assignment), Wal-Mart explains that Bostic did not have an available assistant manager position in his district because of preexisting commitments. (Id. at 14.) This, too, has evidentiary support. The burden now returns to Allen to expose Wal-Mart's justification as a pretext in order to raise an inference of discriminatory motive.

### a. *The fashion manager position*

---

[18]     It appears from Allen's testimony that at least one of the other assistant manager trainees was younger than Allen and that at least one was male. (Allen Dep. at 139-140.) Additionally, Heinbaugh's testimony about commuting distances supports an inference that these other employees were not making comparable commutes. Nevertheless, this is something of an indulgence as Allen did not describe the age or sex of the other people in the program in her statement of material facts.

Allen argues that Wal-Mart's reliance upon Patterson's apparel experience and store management experience is pretextual because:  (i) Heinbaugh testified that apparel experience was not "an extremely important qualification" for the position;  (ii) the job description and interview script did not state that apparel experience was significant;  (iii) the announcement concerning the restructuring included statements to the effect that existing district managers for shoes and jewelry would be qualified and would fill many of the new positions;  (iv) Allen fit the bill for the fashion manager position better than Patterson based on the job description and her experience as a district manager for shoes and jewelry;  (v) there were irregularities in the interview process based on Bourget's failure to ask every applicant the identical questions and the evidence that some candidates obtained the interview script in advance;  and (vi) other women also failed to get a fashion manager position that they applied for.  I fail to see how these various contentions can suffice to raise a non-speculative inference of discrimination.  (Pl.'s Mem. in Opp'n at 13-17.)

*i. Heinbaugh's testimony*

Allen places primary emphasis on Heinbaugh's testimony that prior apparel experience was not "extremely important" in order to be a viable candidate for a fashion manager position. She says that this testimony creates conflicting accounts that support an inference of pretext.  As Allen posits it, the contradiction arises from a comparison of Wal-Mart's "extremely important" characterization in litigation and one of its employee's more tepid, "beneficial" characterization. I conclude that this sort of modest tension does not constitute the sort of contradiction that can reasonably support a finding of pretext.  No one has suggested that Allen was unqualified for the fashion merchandiser position for want of any prior experience in Wal-Mart's apparel department.  The parties are agreed that apparel experience was not a prerequisite.  At the other

23

extreme, no one disputes that apparel experience was a significant factor relevant to an application for the position of fashion merchandiser.  At least, it would be entirely unreasonable to argue otherwise.  The record reflects that the apparel department constituted a greater percentage of Wal-Mart's revenue and consumed a great portion of floor space than the shoes and jewelry division.  It is obvious that apparel merchandising would play a major role in the future fashion merchandising division.  With this kind of record, Heinbaugh's mere reservation about embracing Wal-Mart's use of the term "extremely important" is not enough to generate a finding of pretext if, indeed, it warrants any negative inference at all.

### ii.   The language of the job description and interview script

The job description identified fashion merchandising in terms of apparel execution, apparel direction and apparel needs and thereafter described management of fashion merchandising at multiple facilities as an essential function.  This flatly dispels any notion that the job description somehow contradicts Bourget's understanding that apparel experience was a significant qualification to be considered in regard to the applicant pool.  As for the interview script, it is written in terms that emphasize apparel, shoes and jewelry on an equal footing. Nothing about its language weighs against or in favor of Allen's discrimination claim.

### iii.   The restructuring announcement

Allen relates that the restructuring announcement included representations that many fashion manager positions would be filled with existing district managers of shoes and jewelry. There is no promise of employment in this language.  This fact simply has no tendency to establish that Bourget could not have regarded someone with apparel experience and store management experience as a better candidate for the position than someone with experience as a district manger of shoes and jewelry.

*iv. Relative qualifications*

Allen contends that the record is sufficient to let the jury decide whether she was the better candidate for the job and to award damages if it concludes that she was the better candidate.  (Pl.'s Mem. in Opp'n at 15-16.)  She bases this argument on the fact that she had simultaneously managed multiple shoes and jewelry departments in multiple stores, while Patterson had only managed multiple departments in multiple stores in a serial fashion (one store at a time).  In addition, she emphasizes the fact that the record contains some critical reviews of Patterson's performance as store manager and raises some questions about his decision to step down from a store manager position to a co-manager position in 2003.  In Allen's view, this is "sufficient evidence to create a genuine dispute of material fact as to whether Patterson was objectively qualified for the Fashion Manager position in the absence of discrimination against Ms. Allen."  (Id. at 15.)

To begin, the job description identified management of multiple facilities as an essential function and Allen is correct that she had a qualification that Patterson did not, due to the fact that she had managed the shoes and jewelry departments of multiple facilities at the same time. The question is where this fact goes.  It does not really have a tendency to expose Wal-Mart's stated justification as a pretext for discrimination.  Patterson had experience managing multiple stores and consequently had greater familiarity with the apparel department.  At best, these factors simply balance the two candidates.  In effect, Allen scores a point because she had managed multiple shoes and jewelry departments simultaneously.  Patterson, on the other hand, gets a point for his apparel experience, which he gathered from multiple stores (over an equally long, if not longer, period of time).

Of course, added to Patterson's apparel experience is his generalized experience of store management, which takes into account a large number of different departments, including the expanded departments offered in a few of the "super centers" he helped manage.   It must be noted that Bourget (and Wal-Mart) also highlighted this qualification in support of Bourget's decision to give Patterson the fashion manager position.  Consequently, in addition to her effort to minimize the significance of Patterson's apparel experience in relation to her own experience, which at best comes out a wash, Allen would also have the Court entirely discount Patterson's store management experience.  Thus, Allen argues that the fact finder could view Patterson as a liability to Wal-Mart based on critical comments about his performance as the manager of Wal-Mart's Brunswick store.  The problem with this approach is that there is no basis in the record for a fact finder to fairly conclude that Patterson's overall performance was deficient.  Receiving criticism is not a sign of ineptness, particularly when much of the criticism is cast across a spectrum of stores and not isolated on any particular individual alone, such as was the case with most of the criticism in Patterson's most timely performance appraisal.  Moreover, a review of Patterson's more remote performance appraisal for 2003, which Allen characterizes as ending Patterson's tenure as a store manager, reflects an overall rating of 3.3.  This compares with Allen's ratings of 3.3 and 3.5 in her more recent reviews.

In the end, it is difficult to understand how the varied and more intensive experience of several years of store management would not recommend a person to a new management opening as compared with someone whose managerial experience, while also considerable in terms of years, was confined exclusively to a solitary division (two departments).  Of course, it is quite possible that Ms. Allen would have been viewed as the better candidate by another interviewer, but in order to find that Mr. Bourget's evaluation of her qualifications was

26

prejudiced by discriminatory animus toward her on account of age or sex, Allen's evidence would have to be capable of supporting a finding that her qualifications were significantly better than Patterson's.  See Rathbun v. Autozone, Inc., 361 F.3d 62, 75 (1st Cir. 2004) (holding that disparities in qualifications must be "stark" to justify an inference of discrimination).  Such a finding on this record is not warranted.  "Qualifications are notoriously hard to judge and, in a disparate treatment case, more must be shown than that the employer made an unwise personnel decision by [hiring] 'X' [instead] of 'Y.'"  Id. at 74 (1st Cir. 2004).  Allen is effectively asking the Court to put the jury in the impossible position of finding that Patterson's experience managing several apparel departments in sequence in several stores, plus his "meets expectations" performance as an overall store manager is trumped by Allen's experience simultaneously managing the shoes and jewelry departments of several different stores.  Given the relative emphasis that Wal-Mart gives to apparel in regard to the revenue it produces, and given the expanded supervisory responsibilities placed on store managers, it would be an arbitrary determination (or a biased determination) to conclude that Bourget must have been able to recognize Allen as the better candidate and only failed to do so on account of discriminatory animus.  There simply is no reasonably objective basis for treating Patterson's experience dismissively in relation to Allen's relative experience.

*v. Irregularities in the interview process*

Allen argues that a finding of discriminatory animus might be based on "Bourget's total inability to explain his decision to disregard the standardized interview format" and on the fact that Patterson appears to have obtained a copy of the interview script in advance of his interview. (Pl.'s Mem. in Opp'n at 16.)  Allen argues that Patterson was selectively given an advantage that was denied to her based on selective questioning and the opportunity to better prepare.  (Id. at

17.)  The evidence on these issues does not conjure the inference that Allen's advocates.  As for the interview questions, there is nothing in the record to support a finding that Bourget was required to conduct every interview in exactly the same fashion, such as by asking every applicant identical questions.  The hollowness of this argument is reflected by Allen's silence concerning how the selective emphasis on any particular questions in the script might arguably have given an unfair advantage to one interviewee over another.  As for Patterson's advance access to the interview script, it is true that this circumstance reflects an unbalanced playing field, but any inference of discrimination is undermined by the fact that the record gives the equal impression that Ms. Verrier also accessed the script in advance and by the fact that there is no evidence whatsoever that anyone involved in the hiring decision actually supplied the script to either Patterson or Verrier.

### vi.  Other female applicants

Finally, Allen states that "in addition to herself, she knew of at least three other women over the age of forty who were former District Manager S&Js—including at least one in Maine and two in New York—who were rejected for Fashion Manager positions in favor of younger men."  (Pl.'s Mem. in Opp'n at 17.)  This circumstantial evidence is not probative of any discriminatory animus having motivated Bourget's decision to hire Patterson over Allen.  There is simply no way to judge any of these incidents from the evidence that Allen presents, as the record is devoid of any evidence regarding the other women's qualifications or the qualifications of the successful candidates.  If Allen is trying to suggest that Wal-Mart promotes a corporate culture of gender stereotyping that prevents women candidates from advancing, she needs a better developed record than this one.  See, e.g., Dukes v. Wal-Mart, 509 F.3d 1168 (9th Cir. 2007) (cataloguing types of evidence presented, including statistical, expert opinion and

28

anecdotal cases). Notably, Allen has not challenged Wal-Mart's assertion that she has neither preserved nor presented a disparate impact case. (Def.'s Mot. for Summ. J. at 16-18.)

### b.   The Waterville assignment

Wal-Mart asserts that Allen was assigned to Waterville because, at the time of the assignment, there were no available assistant manager positions available in the district Allen lived in. (Def.'s Mot. for Summ. J. at 14.) Allen says this explanation is a pretext for discrimination because Heinbaugh testified that he was not aware of any other assistant manager who was given an assignment requiring such a long commute. (Pl.'s Mem. in Opp'n at 11.) She also argues that Bourget's failure to seek an exception to the Wal-Mart policy requiring six months in a position prior to a transfer brings the existence of discriminatory animus into focus. (Id.)

In her statement of material facts Allen admits that Bostic did not have a position available in his district for Allen. This circumstance existed because Allen joined the training program late and Bostic had already slotted the available positions for the preexisting trainees. Allen's admission effectively confirms Wal-Mart's explanation. It bears noting that, at the time she was admitted into the training program, Allen had lost her existing position in Wal-Mart in a restructuring and had failed to acquire the new fashion merchandiser position she applied for. In effect, she had no position at Wal-Mart. Nevertheless, she was allowed to enter an assistant manager training program late and acquired a full-fledged assistant manager position upon her exit from the program. This occurred despite the fact that she had no legal entitlement to any accommodation. The record reflects that the issue of commuting distance was discussed up front with Allen and that she was told she could seek a transfer closer to home when a position became available. In fact, Allen was permitted to transfer when an opportunity arose, but she was made

29

to postpone her request for transfer until she completed six months in her existing position, in accordance with a company policy she was aware of at the time.  In theory, Bourget may have been able to request an exception from the home office, but there is no way of judging whether his choice to abide by an existing company policy in Allen's case amounted to disparate treatment based on age and/or sex.  Allen has not presented any evidence that Bourget sought an exception for a younger employee or a male employee based on a comparable situation.  She has only offered the fact that some district managers for shoes and jewelry were permitted to apply for a fashion merchandiser position following the restructuring, even if they had not served as district managers for six months.  I do not find that to be a fair comparison.  In Allen's situation she was made to wait less than six months to obtain a transfer that shortened her commute by some 30 miles.  In the other situation, employees faced with involuntary termination were permitted to seek a newly created position similar to the one they had and it is not at all clear that they would not have been eligible to apply for the new positions anyway.  In the end, the evidence that Allen has gathered simply does not generate a genuine issue of material fact whether Wal-Mart's legitimate explanations for the temporary Waterville assignment are a pretext for discrimination.

### c.   *Summation*

In summation, all three of Allen's disparate treatment scenarios fail to generate a trial-worthy issue on counts I and III, either because a *prima facie* claim is not made out or because Allen's circumstantial evidence is insufficient to generate a genuine issue of material fact on the ultimate question of whether Wal-Mart's handling of her employment relationship with the company was motivated by discriminatory animus on account of her age and/or her sex.

## B.   Retaliation

In order to make out a *prima facie* case of retaliation Allen must demonstrate (1) that she engaged in protected activity;  (2) that Wal-Mart subsequently subjected her to an employment measure that was objectively and materially adverse, as in the kind of retaliation that would "dissuade a reasonable worker from making or supporting a charge of discrimination," Burlington Northern & Santa Fe Railway v. White, 548 U.S. 53, __, 126 S. Ct. 2405, 2409 (2006); and (3) that "there existed a causal link between the protected activity and the adverse job action," Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 175 (1st Cir. 2003).

Allen's retaliation claim is based on the fact that she complained to someone about fraternization between two participants in the assistant manager training program, one of whom, she believed, was "hand-picked by Mr. Bostic to be in that class."  (PSMF ¶ 221;  Allen Dep. at 143-44.)  Subsequently, Allen found herself assigned to the Waterville store, which was 62 miles from her home.

Wal-Mart argues that Allen does not have a *prima facie* case because she cannot demonstrate that she engaged in any protected activity.  According to Wal-Mart, generalized workplace complaints about noncompliance with internal fraternization policies are not "protected activity" under Title VII or any other antidiscrimination statute.  (Def.'s Mot. for Summ. J. at 15.)  The law in this Circuit is that the activity or practice opposed by an employee does not have to actually violate Title VII so long as the employee reasonably believes that it does.  Benoit, 331 F.3d at 175.

Allen's response consists of little more than a conclusory sketch.  Allen says that she complained that a male employee "was engaging in a sexual relationship with a subordinate that violated Wal-Mart's fraternization policy."  (Pl.'s Mem. in Opp'n at 19.)  This argument is based on the following statement of material fact:

221.    While in the training program, over her strong objection, Ms. Allen complained about inappropriate sexual conduct by a male member of the training class.  (Allen Dep. at 143-144).

A review of the underlying deposition testimony reflects that Allen complained to the manager of the store where training was taking place and that she "didn't go to Mr. Bostic with it."  (Allen Dep. at 144.)  As for any objective characteristics of the conduct she was complaining about, Allen testified vaguely about "fraternizing" that she evidently did not witness first hand, but "was brought to [her] attention by other hourly associates within the store."  (Id.)  It is entirely unclear how Allen's deposition testimony concerning fraternization becomes "inappropriate sexual conduct" in her statement of fact.  Additionally, Allen fails to offer any statement of fact on the material question of whether she reasonably believed that this fraternization amounted to a violation of Title VII over and above any applicable Wal-Mart fraternization policy.

On this record Allen does not carry her burden of proving that she has a *prima facie* claim.  The material question is whether Allen had a reasonable belief that Title VII's prohibition against sex discrimination was implicated by whatever she saw or heard in the workplace.  In order to generate a genuine issue on that question, Allen needs to provide the Court with some objective facts so it can judge the reasonableness of her thought process.  The record provides only a reference to some kind of "fraternizing" between two people participating in an assistant manger training program.  That limited evidence simply does not permit the Court to determine the material question of whether Allen reasonably believed that the conduct in question constituted sex *discrimination*.  Even if Allen's unsupported statement about "sexual conduct" is indulged, sex between

32

co-workers, in and of itself, is not sex discrimination.  Consequently, I conclude that a

*prima facie* claim of retaliation is not made out.

As an alternative basis for precluding Allen's retaliation claim, Wal-Mart argues that

Allen cannot establish pretext.  For its legitimate, nondiscriminatory justification for the

assignment Wal-Mart offers the fact that "there were no available Assistant Manager positions in

Bostic's district."  (Def. Mot. Summ. J. at 16.)  I conclude that Wal-Mart succeeds with this issue

as well.  In her statement of material facts Allen admits that Bostic did not have a position

available in his district.  On top of that, Allen's testimony is that she complained to someone

other than Bostic concerning the fraternization and there is no evidence offered to establish that

Bostic knew of Allen's participation in any activity designed to enforce Wal-Mart's fraternization

policy.  The record is simply too ambiguous and neglected on essential factual issues for the

retaliation claims in counts II and IV to survive summary judgment.

### Conclusion

Proving discrimination in the workplace based on circumstantial evidence is a relatively

difficult endeavor, particularly when the employment action in question grows out of a company-

wide restructuring that impacts an entire cross section of employees.  In this case Ms. Allen

strongly suspects that she was the victim of sex and age discrimination because she was

approaching 60 and could well be regarded as having certain qualifications that made her a good

fit for a position that went to a younger, male employee.  Ultimately, however, the evidence she

has been able to marshal simply is not sufficient to support a non-speculative finding that her

failure to get the job she wanted and her subsequent frustrations in the workplace were more

likely than not motivated by discriminatory animus as opposed to legitimate, nondiscriminatory

factors.  Accordingly, I RECOMMEND that the Court GRANT Wal-Mart's motion for summary judgment (Doc. No. 43).

<u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

April 18, 2008                          /s/Margaret J. Kravchuk

U.S. Magistrate Judge

34